IN THE UNITED STATES BANKRUPTCY COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

**ENTERED**
**08/09/2010**

|                     |   |                          |
|---------------------|---|--------------------------|
| IN RE               | ) |                          |
|                     | ) |                          |
| WGMJR, INC.,        | ) | CASE NO. 10-31835-H3-11  |
|                     | ) |                          |
| Debtor,             | ) |                          |
|                     | ) |                          |

MEMORANDUM OPINION

        The court has held a hearing on the "Motion of Sterling
Bank for Relief from Stay of Act Against Property Pursuant to
11 U.S.C. § 362(d)" (Docket No. 20).  The following are the
Findings of Fact and Conclusions of Law of the court.  A separate
Judgment will be entered granting the motion.  To the extent any
of the Findings of Fact are considered Conclusions of Law, they
are adopted as such.  To the extent any of the Conclusions of Law
are considered Findings of Fact, they are adopted as such.

Findings of Fact

        WGMJR, Inc. ("Debtor") filed a voluntary petition under
Chapter 11 of the Bankruptcy Code on March 2, 2010.

        Debtor indicated in its Chapter 11 petition that it is
a single asset real estate entity.  (Docket No. 1).  Debtor's
single asset is real property located at 1119 Commerce Street, in
downtown Houston, Texas.  (Docket No. 15, at p. 1).[1]

_____

        [1]The court notes that the property was misidentified in the
schedules as 1119 Congress, rather than 1119 Commerce.  All of
the testimony and appraisals with respect to the instant case, as

In the instant motion, which was filed on April 27, 2010, Sterling Bank ("Sterling") seeks lifting of the automatic stay, in order to foreclose Debtor's  interest in the property. Sterling seeks relief under Section 362(d)(1) of the Bankruptcy Code, for cause; Section 362(d)(2) of the Bankruptcy Code, for lack of equity and absence of necessity for an effective reorganization; and Section 362(d)(3) for failure of Debtors' compliance with single asset real estate provisions. (Docket No. 20).

Debtor and Sterling have stipulated that Debtor executed a note dated February 1, 2007, in the original principal amount of $2.5 million, secured by a deed of trust on the property and an assignment of leases and rents.

Sterling has filed a proof of claim, in the amount of $2,655,565.32.  Jennifer Keen, an employee of Sterling, testified that Sterling calculated the amount due as set forth in its proof of claim using the default rate of 18 percent interest.  She testified that, at the default rate, approximately $125,000 in interest has accrued postpetition.

Keen testified that the nondefault contract rate is 1.75 percent above the prime rate published in the Wall Street Journal, and was 5 percent on the date of the hearing on the

---

well as Debtor's disclosure statement, identify the property as
1119 Commerce.

2

instant motion.  She testified that, if Sterling's claim were calculated as of the petition date at the nondefault rate, it would consist of principal in the amount of $2,268,141.88, plus prepetition interest in the amount of approximately $107,000.[2] She testified that approximately $40,000 in interest would have accrued postpetition at the nondefault rate.  She testified that approximately $20,000 has been paid.

The parties have stipulated that Debtor tendered interest only payments to Sterling, on May 27, 2010 and June 30, 2010, in the amounts of $9,765.62 and $9,450.60, respectively.

The parties have stipulated that the building located at the property has 20,535 square feet of rentable area, on two floors.[3]  William G. Marlin, Jr., Debtor's sole owner and president, testified that the first floor of the building has 18,804 square feet  He testified that, on the first floor, a space of 1,350 square feet is rented by the operators of a Quizno's restaurant.  He testified that, prior to 2005, when the Quizno's lease was signed, the only tenant in the building was a convenience store that was owned entirely by Marlin.  He testified that, since the petition date, Debtor has signed a

_____

[2]The court notes that these two amounts total $2,375,141.88.

[3]The building also has a basement, and two sub-basement levels.  William G. Marlin, Jr. testified that the basement level and the two sub-basement levels are below the high water line of Buffalo Bayou.  He testified that Debtor is presently unable to obtain an occupancy permit for those levels.

lease with a bail bondsman to lease 1,250 square feet.  He
testified that Debtor has signed a lease with another entity
owned by Marlin to expand the space previously occupied by the
convenience store from approximately 5,000 square feet to
approximately 6,000 square feet, for use as a pawn shop.

Marlin testified that Debtor acquired the property
during 1989.  He testified that Debtor's acquisition of the
property was owner-financed.  He testified that the building was
built during the 1920s.  He testified that, during the early
1990s, Debtor attempted to develop the property as a nightclub.
He testified that Debtor's efforts to develop the nightclub
failed.  He testified that, in approximately 1995, Debtor
borrowed funds, secured by the property, in order to do some
redevelopment.  There is no evidence that the funds borrowed were
used for redevelopment of Debtor's property.

Marlin testified that Debtor obtained its loan from
Sterling during February, 2007.  He testified that, at the
closing of the Sterling loan, he personally obtained $500,000 in
proceeds from the loan.  He testified that a portion of the
$500,000 was invested in Debtor's property.  He testified that
the portion so invested was not a major portion.  He testified
that, in addition to his receipt of $500,000 in cash proceeds, an
additional amount was set aside from the loan to make the monthly
payments due under the loan for 20 months.  The court takes

judicial notice that 20 months after February, 2007 was October, 2008.

During September, 2008, Hurricane Ike swept over southeast Texas, including the Houston, Texas area. Marlin testified that Debtor made a claim for damages on its insurance policy.

Keen testified that, before she became the servicing officer with respect to the loan, Debtor forwarded to Sterling a $100,000 advance on Debtor's insurance claim. She testified that the previous servicing officer at Sterling set aside the $100,000 advance to be applied to regular monthly payments on the loan. She testified that, as of November, 2008, with the application of the $100,000 advance, Debtor was current in its payments to Sterling on the loan.

Keen testified that the $100,000 advance of insurance funds was exhausted during April, 2009, and Debtor made no further direct payments to Sterling on the loan.

On April 19, 2009, Debtor and Sterling executed a modification agreement. The modification agreement called for Debtor to pay Sterling monthly payments in the amount of $19,176.60, based on a 15 year amortization of the note. The modification agreement provided for a maturity date of March 15, 2011. (Sterling Exhibit 4). Marlin has executed a personal guaranty of the note.

Keen testified that, in October, 2009, Debtor forwarded to Sterling an additional $192,187.52 in insurance proceeds. She testified that she had a meeting with Marlin on October 9, 2009, at which Marlin requested that the insurance proceeds be applied to monthly payments, as the previous insurance proceeds had been applied. She testified that she informed Marlin she "didn't see an issue with it, but I would have to get approval."

Keen testified that, either the same day of her meeting with Marlin, or the next day, she conferred with Sterling's management about the application of the payments. She testified that Sterling determined to apply the insurance proceeds to principal, rather than as regular monthly payments. She testified that Sterling's decision was communicated to Marlin through a letter prepared by Sterling's counsel.

Keen testified that the reasons for Sterling's decision to apply the insurance proceeds to principal were that the loan was six months past due; Sterling had obtained an appraisal that showed a decrease in the collateral value such that Sterling was undersecured; the insurance proceeds ended up being $100,000 less than Debtor had anticipated; and there was no plan on how the debt was going to be serviced going forward.

Keen testified that Marlin indicated, at the meeting on October 9, 2009, that he was looking at turning the property into a parking garage. She testified that, when she asked for

6

specific details, Marlin was unable to present a business plan addressing a time period for repayment of the loan, the costs involved in turning the property into a parking garage, or how he would raise the money to do so.

Marlin testified that he believes there is great opportunity in the future with this property.  He testified that the property is the only privately owned piece of real property on the south bank of Buffalo Bayou between Shepherd Drive and Lockwood Drive.  He testified that the property is the last remaining piece of property that Harris County, Texas needs to acquire for construction of a hike and bike trail.  He testified that the property is located "in the middle of the county complex, between the detention, judicial, and administrative branches of government."

Marlin is a sophisticated businessman.  He testified that he controls entities which own several other parcels of real property in downtown Houston, Texas.  He testified that five of these properties are operated as parking lots.  He testified that one of these properties other than Debtor's property is improved with a building.  He testified that he has sought to purchase other properties located in and around the downtown Houston, Texas area.  He testified that he owns a building north of Buffalo Bayou, and bid on additional property on the south bank of Buffalo Bayou that was ultimately acquired by the Buffalo

7

Bayou Partnership.

Marlin testified that he believes a great future value can be obtained by operating the property either as a high-rise parking garage, or as a high-rise high density office building. Under either of these visions, he anticipates that the first floor would be leased to retail shops.  He testified that the decision of whether to build a parking garage or an office building depends on where the government of Harris County, Texas locates various buildings.  He testified that he initially believed that the county would locate a new family law center across the street from Debtor's building.  He testified that, if the new family law center were located across the street, Debtor would build a parking garage.  He testified that, approximately two years ago, the county stopped plans to build the family law center across from Debtor's property, instead choosing to build the new family law center in the location of the old county jail facility.  He testified that, since the family law center will be built in the location of the old jail facility, two blocks away, the county will be forced to build its new administration building across the street from Debtor's property.

The parties have stipulated that Debtor has no employees.  Debtor has scheduled unsecured debts in the aggregate amount of $8,602.28, owed to six creditors.  Debtor has scheduled ad valorem taxes owing of $83,636.00, for the years 2009 and

8

2010.[4]

Debtor has filed no operating reports.  At the hearing on the instant motion, Marlin testified that he had testified at the meeting of creditors held on April 15, 2010 that Debtor's previous bookkeeper had left, and that Debtor had not hired a new bookkeeper.[5]  He testified at the meeting of creditors that he had several resumes from potential replacement bookkeepers.  He testified at the hearing on the instant motion that he has not hired a new bookkeeper, and that he believes he cannot file operating reports for Debtor until he has hired a bookkeeper.

Marlin testified that Debtor's income from the Quizno's lease is approximately $4,000 per month.  He testified that, beginning in the middle of July, 2010, Debtor will receive income of $6,000 per month from the bail bondsman's lease.

Marlin testified that, as to the pawn shop, he anticipates that Debtor will earn income of $12,000 per month.  However, he testified that the pawn shop will require the participation of an equity investor, willing to invest at least $200,000 in exchange for 50 percent of the equity.  He testified that he has had discussions with a potential investor, but that

---

[4]Marlin testified that the 2010 taxes must be paid on or before January 31, 2011.  Harris County, Texas has filed a secured proof of claim, in the amount of $83,636.48, for ad valorem taxes.

[5]Marlin testified that this bookkeeper had also been the bookkeeper as to several of his other entities.

there is no written agreement for the potential investor to invest.[6]

Marlin also testified that he is seeking to obtain tenants for the remaining spaces in Debtor's building. He testified that, in order to lease the remainder of the first floor to tenants, Debtor must install HVAC, plumbing, and electrical service. He estimates the cost of such installation to be $100,000. He testified that he lacks sufficient funds to make the investment. He testified that he intends to seek an equity investor to fund the construction of the remainder of the space for lease to tenants.

Marlin testified that he did not previously seek to lease the building to tenants because he was waiting for Harris County to make its decision as to where it intended to locate the new family law center. He testified that he first became aware two years ago that Harris County did not intend to build the family law center across the street from Debtor's property. He testified that he first became aware, when Harris County published its Capital Improvement Program document on June 22, 2010, that the county intended to build a new family law center on the location of the old jail facility, and build a new

---

[6]Marlin testified that he has held a license for operation of a pawn shop for several years, but that he "activated" the license approximately 60 days before the date of the hearing on the instant motion.

10

administration building.[7]

Both Sterling and Debtor presented reports and testimony from appraisers regarding Debtor's property, and Marlin also expressed a lay opinion as to the value of the property. Brad Kangieser, Sterling's appraiser, Michael Lane, Debtor's appraiser, and Marlin all agree that the highest and best use of the property is to hold the property for future development, and rent the existing property to tenants as an interim use.

Kangieser testified that he believes the value of Debtor's property is $2.05 million. He testified that the building is in fair to poor condition, and needs improvement.

Kangieser testified that he reached his conclusion as to value giving a sales comparison approach the greatest weight. He testified that he reviewed five sales of property in and around downtown Houston near Debtor's property, and made downward adjustments for time (that is, a downward adjustment to the comparable sales reflecting a decline in current economic conditions from the time at which the previous sales took place), for superior market locations, for frontage on major roads, and for site characteristics.

---

[7]The court makes no finding as to whether Harris County actually intends to build the buildings in the locations where Marlin anticipates they will be built. Marlin admitted on cross examination that it could be 5-10 years until a new administration building is built, and that he is unsure where the administration building will be built.

11

The first sale Kangieser analyzed was the sale of
property located at 619 Preston Street, a full city block bounded
by Preston, Louisiana, Smith and Congress streets.  He testified
that the property was 1.46 acres, and sold for $15.9 million, or
$249.98 per square foot.  Kangieser's report (Sterling Exhibit 6)
reflects that he adjusted the price per square foot downward by
15 percent for time (the reported sale was in May, 2007), 10
percent for location (according to Kangieser's report, the
property is located "closer to the trend of development in
Downtown"), 20 percent for frontage (the property has frontage on
four streets; Debtor's has frontage on two streets); and 15
percent for site characteristics (the comparable property is
partially in the flood plain; the majority of Debtor's property
is in the flood plain).  Kangieser reached an indicated adjusted
value for the first property of $116.87 per square foot.

The second sale Kangieser analyzed was the sale of
property located at 609 Main Street, a partial city block bounded
by Main Street, Capitol Street, and Texas Avenue.  He testified
that the property was 1.278 acres, and sold for $10.5 million, or
$188.54 per square foot.  Kangieser's report reflects that he
adjusted the price per square foot downward by 15 percent for
time (the reported sale was in August, 2007), 10 percent for
location, and 25 percent for site characteristics (the property
is presently used as a parking lot).  Kangieser reached an

indicated adjusted value for the second property of $104.17 per
square foot.

The third sale Kangieser analyzed was the sale of
property located at 1515 Rusk Street, a partial city block with
frontage on Rusk, La Branch, and Capitol Streets.  He testified
that the property was 0.72 acres, and sold in December, 2007 for
$6.25 million, or $199.28 per square foot.  He testified that the
property was purchased for future construction of a hotel, but
that the hotel was not built.  He testified that the purchaser's
interest in the property was foreclosed, and the property was
sold again during December, 2009 for $128 per square foot.
Kangieser's report reflects that he adjusted the $199.28 per
square foot price downward by 15 percent for time, 10 percent for
location, and 25 percent for site characteristics (the property
is presently used as a parking lot).  Kangieser reached an
indicated adjusted value for the third property of $110.10 per
square foot.

The fourth sale Kangieser analyzed was the sale of
property located at 1010 North San Jacinto Street, a 0.326 acre
property located north of Buffalo Bayou.  Kangieser's report
reflects that the property sold for $1.2 million, or $84.61 per
square foot.  Kangieser adjusted the price downward by 15 percent
for time (the sale reported sale was in April, 2008), and upward
by 25 percent for location (the property is located outside

13

downtown, on the north side of Buffalo Bayou) and 20 percent for
frontage (the property has frontage on only one street).
Kangieser reached an indicated adjusted value for the fourth
property of $104.28 per square foot.

The fifth sale Kangieser analyzed was the sale of
property located at 1301 Commerce Street and 1401 Commerce
Street, an irregular 2.09 acre tract consisting of Blocks 6 and
7, bounded by Commerce and La Branch Streets, and Buffalo Bayou,
on October 9, 2009.  Kangieser testified that his initial
understanding was that the sale price was $7.3 million, or $80.17
per square foot.  Kangieser's report indicates that he adjusted
the price upward by 10 percent based on the size of the property,
to reach an indicated adjusted value for the fifth property of
$88.19 per square foot.

In Kangieser's report, he states that he weighted the
fifth sale most heavily, because it was more recent, and the
property was located closer to Debtor's property than the other
properties whose sales he deemed comparable.  He determined that
a market value for the Debtor's property was $95 per square foot,
or $1.8 million.

Kangieser testified that he subsequently learned, from
reading Lane's report, that the fifth sale included a donation
for tax purposes.  He testified that he was able to confirm
through discussions with a broker involved in the sale that such

14

a donation took place.  He testified that he made a subsequent adjustment to the fifth sale based on the conditions of sale, and when applied to his opinion as to a proper value for Debtor's property, increased his estimate of the value of Debtor's property to approximately $110 per square foot, or $2.05 million.[8]

Lane testified that he believes the value of Debtor's property is $3 million.  He testified that, like Kangieser, he valued the property based on the sales comparison approach, and did an abbreviated income approach to test the value he reached based on the sales comparison approach.

Unlike Kangieser, Lane did not quantify the amount of each adjustment he made to the sales he deemed comparable.  He listed each of his comparable sales as "superior," "similar," or "inferior," with respect to time adjustment, conditions of sale, size, location, corner influence, site characteristics, and utilities.  Also, notwithstanding Lane's conclusions regarding the necessity for adjustments, the adjusted sale price of each of the eight sales listed in the sales adjustment grid is the same

---

[8]The court notes that Kangieser also valued the Debtor's property on the basis of an income approach at $1.8 million.  In light of Kangieser's testimony that he adjusted his final opinion of the value based entirely on the conditions of sale of just one sale, the fifth sale addressed in his report, the court gives no weight to Kangieser's analysis based on the income approach.

as the unadjusted sale price.[9]

The first sale Lane analyzed was the same property as the first sale Kangieser analyzed, 619 Preston Street.  In the land sales adjustment grid, Lane retains the $249.98 per square foot sales price as the adjusted sale price of the first sale he analyzed.

The second sale Lane analyzed was the sale of property located at 800 Walker Street, a full city block bounded by Walker, Rusk, La Branch, and Crawford Streets.  Lane's report indicates that the 1.467 acre property was sold in May, 2007 for $9.585 million, or $150 per square foot.

The third sale Lane analyzed was the second sale Kangieser analyzed, 609 Main Street, at $188.54 per square foot.

The fourth sale Lane analyzed was the third sale Kangieser analyzed, 1515 Rusk Street, at $199.28 per square foot.

The fifth sale Lane analyzed was a subsequent sale of property located at 609 Main Street.  Although a tract of 55,691 square feet was the property that was the subject of the second sale Kangieser analyzed, and the third sale Lane analyzed, the fifth sale Lane analyzed included the full block, consisting of the 55,691 square feet, plus a tract of an additional 7,689

---

[9]For example, the first property Lane analyzed, at 619 Preston, sold for $249.98 per square foot.  Lane's adjusted sale price is $249.98 per square foot.

16

square feet.  Lane's report indicates that on March 12, 2008, the property was sold for $20,758,218, or $327.52 per square foot.

The sixth sale Lane analyzed was property located at 1515 Dallas Street.  Lane's report indicates that the property contains 17,500 square feet, and was sold on November 7, 2008 for $5.6 million, or $320 per square foot.

The seventh and eighth sales Lane analyzed together comprise the sale that Kangeiser identified as his fifth sale. Lane testified that the properties are presently used as parking lots.  Lane's report indicates that Block 6, consisting of 1.188 acres at the northwest corner of Commerce and Austin Streets, was sold on October 9, 2009 for $6,979,117, or $134.89 per square foot.  His report indicates that Block 7, consisting of 0.903 acres at the northeast corner of Commerce and Austin Streets, was sold on October 9, 2009 for $4,368,854, or $111.12 per square foot.  However, the notes to Lane's report indicate that the cash sale prices of the two blocks were $4,231,789 and $2,577,579, respectively.[10]  Lane testified that the higher reported sale price was an agreed-upon appraisal value between the buyer and the seller.  He testified that the parties to the two transactions reported the lower cash price as a sale, and reported the difference between the cash price and the appraised

---

[10]These amounts represent $81.79 and $65.56 per square foot, respectively.

17

value as a donation to the benefit of the sellers for tax
purposes.  He testified that he gave a dollar-for-dollar credit
for the tax donation to arrive at the value he used for these
sales in his appraisal report.

Lane testified that, in light of the range of values
between $112 and $327 per square foot for the eight sales he
believes comparable, he adjusted some up, some down, and arrived
at a value for Debtor's property of $160 per square foot, or $3
million.

Each of the two appraisers expressed opinions as to the
report of the other appraiser.  Kangieser testified that he
believes the tax benefit to the seller should not have been added
to the sale price of Blocks 6 and 7 on a dollar-for-dollar basis.
He testified that, because Lane did not quantify the adjustments
he made, he is unable to review Lane's methodology with respect
to Lane's opinion as to value.  Lane testified that he does not
believe the fourth sale Kangieser identified, 1010 North San
Jacinto Street, is comparable, because it is located north of
Buffalo Bayou.  He testified that, with respect to Blocks 6 and
7, he believes Kangieser adjusted the value downward too much for
site characteristics, because Debtor's property is bulkheaded on
the Buffalo Bayou side.

Marlin testified that he believes the value of the
property is no less than $200 per square foot, or $3.7 million.

18

He testified that his opinion is based on comparison to a sale of property located 250 feet from Debtor's property in 2003, for $220 per square foot.

On June 30, 2010, Debtor filed a plan of reorganization.  As to classes other than Sterling's loan, Debtor's plan provides generally for payment in full of administrative expenses on the effective date, ad valorem tax claims over six years, and unsecured claims over five years.  As to Sterling's loan, Debtor proposes to give Sterling a new note, with a balloon payment due five years after the effective date, and monthly payments in the interim calculated based on a 30 year amortization schedule, at an interest rate of 1.5 percent above the prime rate published in the Wall Street Journal.  The plan provides that Marlin will retain sole ownership of the Debtor.

The plan filed by Debtor does not address a source of funds to make the balloon payment called for under the plan. Marlin presented no evidence as to Debtor's ability to do so.

### Conclusions of Law

Section 362(d) of the Bankruptcy Code provides in pertinent part:

> (d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay--

19

(1) for cause, including the lack of adequate protection of an interest in property of such party in interest;

(2) with respect to a stay of an act against property under subsection (a) of this section, if-

    (A) the debtor does not have an equity in such property; and

    (B) such property is not necessary to an effective reorganization;

(3) with respect to a stay of an act against single asset real estate under subsection (a), by a creditor whose claim is secured by an interest in such real estate, unless, not later than the date that is 90 days after the entry of the order for relief (or such later date as the court may determine for cause by order entered within that 90-day period) or 30 days after the court determines that the debtor is subject to this paragraph, whichever is later--

    (A) the debtor has filed a plan of reorganization that has a reasonable possibility of being confirmed within a reasonable time; or

    (B) the debtor has commenced monthly payments that--

        (i) may, in the debtor's sole discretion, notwithstanding section 363(c)(2), be made from rents or other income generated before, on, or after the date of the commencement of the case by or from the property to each creditor whose claim is secured by such real estate (other than a claim secured by a judgment lien or by an unmatured statutory lien); and

        (ii) are in an amount equal to interest at the then applicable nondefault contract rate of interest on the value of the creditor's interest in the real estate.

11 U.S.C. § 362(d).

Section 362(g) of the Bankruptcy Code provides:

(g) In any hearing under subsection (d) or (e) of this section concerning relief from the stay of any act under subsection (a) of this section--

(1) the party requesting such relief has the burden of proof on the issue of the debtor's equity in property; and

(2) the party opposing such relief has the burden of proof on all other issues.

11 U.S.C. § 362(g).

The provisions of Section 362(d)(3) are separated by the word "or," and thus are read disjunctively.  In the instant case, Debtor has commenced making payments in an amount equal to interest at the nondefault contract rate.  Thus, the stay does not lift under Section 362(d)(3).

"Equity" as used in Section 362(d)(2) means the difference between the value of the subject property and the encumbrances against it.  Matter of Sutton, 904 F.2d 327 (5th Cir. 1990).

The question of whether a property is necessary to an effective reorganization depends, in the first instance, on whether the debtor can show a reasonable prospect for a successful reorganization within a reasonable time.  The debtor must do more than manifest unsubstantiated hopes for a successful reorganization.  In re Canal Place L.P., 921 F.2d 569 (5th Cir. 1991).

21

What constitutes "cause" for the lifting of the stay
pursuant to Section 362(d)(1) is not defined in the Bankruptcy
Code.  Whether cause exists must be determined on a case by case
basis based on an examination of the totality of circumstances.
In re Reitnauer, 152 F.3d 341, 343 n. 4 (5th Cir. 1998); In re
Mendoza, 111 F.3d 1264 (5th Cir. 1997).

With respect to a reasonable prospect for
reorganization in the instant case, Debtor is making attempts to
increase revenue from the Debtor's building.  However, Debtor is
apparently unable to make further increases in revenue without
obtaining substantial outside investments.  There is insufficient
evidence to support Marlin's belief that he will be able to
obtain such investments, either in Debtor, for the purposes of
buildout of Debtor's building, or in San Jacinto Pawn, to open a
pawn shop in the building.

As to the value of the property, none of the opinions
presented, Kangieser's, Lane's, or Marlin's, carry significant
weight.  Although Kangieser has at least quantified the amounts
of the adjustments he made to the sales he believes comparable,
the court does not find that any of the sales are truly
comparable to the Debtor's property.  Debtor's property is
uniquely located, and its location and site characteristics do
not support its valuation on the assumption that space in

22

downtown Houston is a fungible commodity.  Moreover, the
adjustments made by Kangieser range from ten to sixty percent of
the values of the respective properties asserted to be
comparable.  Yet, neither in Kangieser's testimony nor in his
report did he address the method he used to determine that the
amount of the adjustment he made to each purportedly comparable
sale was reasonable.

With respect to Lane's appraisal, there is no
explanation at all of the amount of his adjustment or the method
by which he made such adjustments.  Lane's testimony does not
shed additional light on this issue.

Marlin's opinion addresses the closest thing to
anything resembling a sale of comparable property, because it
involves property located 250 feet from Debtor's sale.  However,
the sale involved occurred, according to Marlin, seven years ago,
and Marlin has made no adjustment for the time, frontage, or site
characteristics.[11]  The court concludes that the proof is
insufficient and inconclusive as to the question of the value of
the property.

As to the amount of the debt, the parties have a
dispute as to whether the nondefault rate or the default rate

---

[11]The court notes additionally that Marlin's report of the
2003 sale is hearsay.  Although some latitude is given, under
Rule 703 of the Federal Rules of Evidence, to hearsay considered
by an expert in forming the expert's opinion, Marlin was not
qualified as an expert, and has not been recognized as such.

should apply.  The dispute between Debtor and Sterling is apparently grounded in the issue of whether Sterling was correct in applying the insurance proceeds to the principal balance rather than setting it aside to make monthly payments on the note.  It is apparent that Debtor filed the instant Chapter 11 case for the purpose of seeking an advantage in this dispute with Sterling.  Debtor appears to have no financial reason for the filing of the instant case other than to seek a favorable determination on the underlying question of whether Sterling correctly applied the insurance proceeds, and to give Debtor an additional five years in hopes that the market will turn. Because Sterling's proof on the value of the property is inconclusive, the court does not reach the question of whether the default rate or the contract rate applies.  The court concludes that Sterling has failed to meet its burden of proof on the question of the Debtor's equity in the property.

However, the stay in the instant case should lift for cause.  First, Debtor's filing of the instant Chapter 11 case for the purpose of obtaining an unfair advantage in a two party dispute leads the court to the conclusion that the case was not filed in good faith.  See In re Starmark Clinics, LP, 388 B.R. 729 (Bankr. S.D. Tex. 2008); See also In re Mazzocone, 200 B.R. 568 (E.D. Pa. 1996).  The absence of good faith constitutes cause for lifting of the automatic stay.  In re Matter of Little Creek

24

<u>Dev. Co.</u> 779 F.2d 1068 (5th Cir. 1986).[12]

Moreover, the evidence indicates the Debtor's inability to provide adequate protection of Sterling's interest in Debtor's property.  Debtor has present revenue of $4,000 per month, and it appears it will have additional revenue of $6,000 per month beginning in July, 2010.  This revenue is insufficient to pay the Debtor's expenses and also provide funds to make adequate protection payments to Sterling.[13]  The only other apparent potential source of revenue during the short term is Debtor's lease with the San Jacinto Pawn Shop, an entity controlled by Marlin, and as to which Marlin's testimony is that it cannot begin operations unless and until it obtains a sizable capital investment from a new equity investor.  Marlin has testified that he is unable to provide capital for the pawn shop, though apparently he continues to seek out real estate investments in his individual capacity.  There is insufficient evidence as to Marlin's ability to quickly obtain the needed equity investor for San Jacinto Pawn, such that it would contribute to Debtor's

───────────

[12]The court notes that, since <u>Little Creek</u>, the Fifth Circuit has opined, in <u>In re Humble Place Joint Venture</u>, 936 F.2d 814 (5th Cir. 1991), that a one-asset real estate venture could invoke Chapter 11 in good faith.  However, the holding of <u>Little Creek</u> cited by this court, that the absence of good faith may constitute cause for lifting of the stay, remains good law.

[13]The court notes that these projected monthly revenues are barely larger than the $9,765.62 and $9,450.60 paid to Sterling in May and June, 2010, but they do not provide any additional funds for expenses.

revenues in the short term.  Likewise, Debtor's intermediate term plan to increase revenues by leasing the remainder of the first floor property to individual lawyers requires a significant capital investment, which Marlin is unprepared to make, and there is no evidence he will be able to raise such capital.

Additionally, Debtor has filed no reports of operations.  A Chapter 11 debtor is required to file operating reports.  BR 2015(a)(3).  The court concludes, considering the totality of the circumstances in the instant case, that the automatic stay should lift, for cause.

Based on the foregoing, a separate Judgment will be entered granting the "Motion of Sterling Bank for Relief from Stay of Act Against Property Pursuant to 11 U.S.C. § 362(d)" (Docket No. 20).

Signed at Houston, Texas on August 9, 2010.

LETITIA Z. PAUL
UNITED STATES BANKRUPTCY JUDGE